ASSOCIATED MILK PRODUCERS, INC., Plaintiff–Appellant,

v.

MEADOW GOLD DAIRIES, INC., Defendant–Appellee.

No. 93–1350.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1993.

Decided June 17, 1994.

John A. St. Peter (argued), Paul W. Rosenfeldt, Edgarton, St. Peter, Petak, Massey & Bullon, Fond du Lac, WI, for plaintiff-appellant.

Thomas L. Shriner, Jr., James T. McKeown (argued), Foley & Lardner, Milwaukee, WI, for defendant-appellee.

Before BAUER, CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

This appeal requires us to determine whether the district court erred in granting summary judgment in favor of a dairy in a contract dispute between the dairy and its milk supplier. For the reasons stated below, we affirm.

I.

The dispute arose from Meadow Gold Dairies' efforts to secure raw milk for its milk processing plant from Associated Milk Producers, Inc. (AMPI). Meadow Gold is a Delaware corporation with its principal office in Champaign, Illinois. AMPI is a cooperative association incorporated in Kansas, which maintains a regional office in Wisconsin. AMPI also belongs to a dairy marketing cooperative known as the Southern Illinois Super Pool, which sets a price for milk sold by its member cooperatives. The Super Pool price includes both the federal minimum "blend price" established under the Southern Illinois–Eastern Missouri Federal Milk Marketing Order and an additional "over order" surcharge set jointly by Super Pool members. The surcharge is distributed to Super Pool members based on transportation costs and other factors, in such a way that raw milk customers pay the same Super Pool price regardless of which Super Pool member cooperative actually supplies the milk.

Prior to October, 1989, Meadow Gold paid the Super Pool price for all milk shipped by AMPI except that shipped from AMPI's Platteville, Wisconsin facility. For milk shipped from Platteville, Meadow Gold paid the Super Pool price and then was invoiced or credited for the difference between AMPI's costs and the Super Pool price. AMPI billed or credited Meadow Gold for this differential amount through an "equalization" account. Under this arrangement, Meadow Gold also leased the Platteville facility from AMPI and placed two of its employees in the facility to operate it. AMPI gave Meadow Gold credit for these lease and labor costs through the equalization account, but charged Meadow Gold a marketing fee and for various costs of procuring milk. As a result of the "equalization" charge, in 1989, Meadow Gold paid several hundred thousand dollars more for milk from Platteville than it would have paid had AMPI charged only the Super Pool price.

In the summer of 1989, Meadow Gold began to negotiate with AMPI regarding the price of raw milk shipped from Platteville. On September 11, 1989, Meadow Gold informed AMPI, orally and in writing, that, beginning October 1, 1989, Meadow Gold would no longer pay more than the Super Pool price. On September 19, AMPI responded in writing to Meadow Gold's letter of September 11. AMPI's letter notified Meadow Gold of new Super Pool price levels, adding that it would continue billing Meadow Gold to cover production costs that AMPI incurred which were not covered by the new Super Pool charge (i.e., the equalization amount).[1] The September 19 letter also indicated that AMPI was "continuing to work with other participants in the super pool to review and alter the methods by which pool income is generated and dispersed [sic]."

---

1. The September 19 letter stated:
AMPI will apply any increase over-order dollars generated by the increased [Super Pool] price levels to its cost of procuring and transporting milk to Borden–Meadow Gold. However, should these dollars not cover the entire cost, we will continue to invoice Borden–Meadow Gold for the difference.
Br.Aplt., App. at 21, ¶ 1.

Br.Aplt., App. at 21, ¶ 2. On September 29, Meadow Gold reiterated that it would only pay the Super Pool price and at the same time canceled its Platteville lease and production responsibilities.[2] AMPI did not respond to Meadow Gold's September 29 letter but did assume responsibility for the lease, for operations in Platteville and for shipping milk from Platteville to Champaign. AMPI also discontinued the equalization account, though it claims that it recorded costs and intended to bill Meadow Gold for costs in excess of the Super Pool charge (i.e., the same costs that had been captured in the equalization account). R. 34: Vanthournot Dep. (Nov. 23, 1992), at 70–75. Through October and November of 1989, AMPI never told Meadow Gold of any intention to charge more than the Super Pool amount. R.35: Vanthournot Dep. (Aug. 18, 1992), at 130–33.

In December, 1989, AMPI invoiced Meadow Gold for the period beginning in October, 1989, including both the Super Pool price and the former "equalization" costs associated with running Platteville. The costs in excess of the Super Pool price totaled $547,684.22 for the months in dispute. Meadow Gold reiterated its refusal to pay costs in excess of the Super Pool amount. R.34: Vanthournot Dep. (Nov. 23, 1992), at 100. When AMPI refused to sell Platteville milk at the Super Pool price, Meadow Gold switched suppliers for a time in order to obtain the necessary raw milk at the Super Pool price. R.28: Purdy St., ¶¶ 5–6. AMPI thereafter continued to ship Meadow Gold two or three truckloads of raw milk each day from Platteville at the Super Pool price. R.35: Vanthournot Dep. (Aug. 18, 1992), at 102–03. AMPI filed suit in August, 1992, to recover the $547,-684.22.

The district court granted summary judgment in favor of Meadow Gold, holding primarily that, in delivering milk during the relevant months, AMPI accepted the price terms stated in Meadow Gold's September 29

letter. AMPI moved to vacate or for reconsideration of the judgment, motions the district court denied. Judgment for Meadow Gold was entered on February 3, 1993.

## II.

Summary judgment is appropriate if the affidavits and materials on file with the court show that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir.1987). "In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party." *Id.* (citing *Matsushita Electric Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The primary question before us is: What price did Meadow Gold agree to pay AMPI for the milk shipped from AMPI's Platteville facility to Meadow Gold's plant in Champaign during October, November and December of 1989? Did AMPI and Meadow Gold continue to carry on under their accustomed arrangement or did they have a new deal? AMPI requests that we remand this case for trial, arguing that neither the parties' writings nor their conduct supports a new contract and that, even if a contract were shown, it would not follow the terms of Meadow Gold's September 29 letter. Meadow Gold contends that the September 29 letter was a counteroffer which AMPI accepted by its subsequent conduct. Neither party argues that it is bound by the previous arrangement.

### A. *Whether Writings Established a New Contract*

■ Writings between parties to a transaction may not establish a contract when they evidence fundamental differences between the positions of the parties. *Koehring Co. v. Glowacki*, 77 Wis.2d 497, 253 N.W.2d

---

**2.** The September 29 letter stated:

As indicated in my letter dated September 11, 1989 and our phone conversation on September 15, 1989, the Borden–Meadow Gold position is to purchase milk from AMPI as per the announced Southern Illinois Super Pool price effective October 1, 1989.

. . . .

As indicated in our phone conversation of September 15, 1989 ... your company would assume responsibility for the Platteville pump over station on October 1, 1989....

Br.Aplt., App. at 23, ¶ 2.

64, 67–68 (1977). In particular, a disagreement over price may show that the parties failed to reach an agreement. *Id.; Goebel v. National Exchangors, Inc.*, 88 Wis.2d 596, 277 N.W.2d 755, 765 (1979). Even if the parties' writings do not constitute a contract, however, the parties may nonetheless be found to have established a contract through their actions. Wis.Stat. § 402.204(1); *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.*, 635 F.Supp. 1281, 1285 (N.D.Ill. 1986) ("Sellers usually do not ship and buyers do not receive goods unless they think they have struck a deal."); *see also* Wis.Stat. § 402.206 (offer can be accepted by prompt and current shipment or "in any manner and by any medium reasonable in the circumstances"); *Fisher v. Elmore*, 802 F.2d 771, 773 n. 2 (4th Cir.1986) (same). Thus, to determine whether a new contract had been formed, we must look both to the parties' writings and to their actions.

■ Here, both parties agree that their writings alone did not form a contract and we agree. Meadow Gold's September 11 letter informed AMPI that Meadow Gold would no longer pay more than the Super Pool price for AMPI's milk. AMPI responded with a letter informing Meadow Gold that it would continue to bill the dairy in excess of the Super Pool price. Meadow Gold's September 29 letter reiterated the dairy's intention to pay only the Super Pool price, adding that it would also cease to rent or operate the Platteville facility. In short, while each writing indicated on its face that price was an essential term of the arrangement, the writings certainly did not agree on price.[3] The parties were in basic disagreement, and no contract can be found based on their writings alone.

B. *Sufficiency of Intent to Make a New Contract*

But how about conduct considered in conjunction with the writings? Under Wisconsin law, if the parties intend a contract, their conduct may create such an agreement, even

if certain terms are left open or the moment a contract takes effect is unclear. Wis.Stat. § 402.204; *see also* Wis.Stat. § 402.206(1)(b) (offer to purchase may be accepted either by a prompt promise to ship goods or by the prompt shipment of conforming or nonconforming goods); *Ginsu Prods., Inc. v. Dart Industries, Inc.*, 786 F.2d 260, 265 (7th Cir. 1986).

The district court found that the parties' conduct evidenced their intention to contract. Meadow Gold's letters requested a change in the existing milk supply arrangement. The September 29 letter sought an end to equalization billing and expressed Meadow Gold's intention to pay only the Super Pool price. That letter also confirmed the parties' oral agreement that AMPI take responsibility for running the Platteville facility. In response, AMPI shipped the milk and took responsibility for running the Platteville facility. AMPI also took steps to change its billing procedure, although the parties disagree as to the nature and extent of this change. Thus, while the parties disagree on particulars, they both expressed a willingness to modify their existing milk supply arrangement. Thus, the parties met the threshold requirement of intending to form a new contract and we must consider whether writings and conduct actually produced a new deal.

C. *Whether There Was a Contract Formed By Conduct*

■ The fact that goods are shipped and received does not necessarily establish that a contract existed. *See, e.g., Quaker State Mushroom Co.*, 635 F.Supp. at 1285 (holding that no contract was formed despite shipment and acceptance of mushrooms). However, we reject AMPI's efforts to characterize this case as one in which the only conduct demonstrating that a contract existed is the shipment of goods. AMPI attempts, Br.Aplt. at 9–10, to draw an analogy between this case and *Quaker State Mushroom Co.* In *Quaker State*, the buyer issued purchase orders referring to existing prices, after which

---

3. At the same time, the parties clearly did not intend to contract without an agreement on price, since their conflicting writings focused on price. As we indicate below, however, AMPI's

conduct subsequent to Meadow Gold's September 29 letter manifested its assent to Meadow Gold's price terms.

the seller issued a notice revoking the existing price list. The seller then delivered the goods and invoiced them at the new price and the buyer accepted the goods. The court noted that, under § 402.305(4), "[w]here ... the parties intend not to be bound unless the price is fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay the reasonable value at the time of delivery and the seller must return any portion of the price paid on account." *Id.* at 1286. The court then denied summary judgment. Resolving the facts against the movant-seller, the court found that the parties' conduct recognized the existence of a contract, but reasoned that the parties intended not to be bound unless they could agree on price and that they had not so agreed. Consequently, the court held that, under § 402.-305(4), a trial was required to determine what price was reasonable.

Here, in contrast, § 402.305(4) does not apply. It seems clear that the parties did not intend to contract without an agreement on price (since their conflicting writings focused on price). On the other hand, AMPI, by its conduct, apparently assented to Meadow Gold's terms. As indicated, Meadow Gold's September 29 letter offered to purchase raw milk from AMPI. The letter stated that Meadow Gold would pay only the Super Pool price for the milk and that AMPI would assume responsibility for the Platte-

ville facility. After receiving this letter and without further protest, AMPI shipped the milk, thus providing goods that conformed to Meadow Gold's offer to purchase. But AMPI did much more than merely ship milk in response to the September 29 letter. AMPI accepted the termination of Meadow Gold's Platteville lease and stopped charging Meadow Gold rent, undertook to employ two Meadow Gold employees at the Platteville facility and assumed responsibility for paying the truckers formerly used by Meadow Gold to haul milk from Platteville to Meadow Gold's Champaign plant.[4]

The only circumstance suggesting that AMPI refused Meadow Gold's terms is that AMPI harbored a secret intention to continue billing Meadow Gold for costs in excess of the Super Pool level. Objective manifestation of intent, not undisclosed subjective intentions, are, however, controlling. *See, e.g., Hoffman v. Ralston Purina Co.,* 86 Wis.2d 445, 273 N.W.2d 214, 217 (1979) ("The question is not the actual intent of the offeree, but his manifested intent. Actions of the offeree can constitute acceptance even when accompanying words express a contrary intent."); Restatement (Second) of Contracts §§ 2 cmt. b, 228; 17A Am.Jur.2d *Contracts* § 27 (1991). Objectively manifested intent must control because there can be no mutual assent unless the parties are aware of each other's intentions. *Theuerkauf v. Sutton,* 102 Wis.2d 176, 306 N.W.2d 651, 658 (1981) ("The ultimate and dispositive inquiry is that an implied in

4. AMPI attempts to minimize the significance of Meadow Gold's requests regarding Platteville. AMPI suggests that its takeover of Platteville was a collateral matter and that Meadow Gold had always had the right to cancel the lease and transfer responsibility for the facility to AMPI. Br.Aplt. at 11–12. This argument is without merit. According to the September 11 letter, Meadow Gold's express goal in reducing the raw milk price to the Super Pool level was to make itself competitive with other dairies with respect to the cost of raw milk. Br.Aplt., App. at 23, ¶ 2. Transferring the cost of running Platteville to AMPI would help accomplish this goal by eliminating costs that Meadow Gold had been covering but that its competitors did not have to pay. In essence, Meadow Gold proposed that AMPI increase its costs while lowering its price. AMPI was understandably resistant to this proposition, so the parties had to negotiate. Meadow Gold's September 29 letter refers to an earlier phone conversation in which Meadow Gold stated that

it was *"willing to back off* on reducing the equalized payment for August and September 1989" and that AMPI "would assume responsibility for the Platteville ... station on October 1, 1989." Br.Aplt., App. at 23, ¶ 4 (emphasis added). Clearly, AMPI's takeover of the Platteville facility resulted from the very price negotiations at issue in the case. Indeed, the September 29 letter purports to summarize these negotiations. *Id.* ¶ 1 ("This is in reference to my letter dated September 11, 1989, our phone conversation of September 15, 1989 and your letter dated September 19, 1989."). Thus, even if Meadow Gold always had the option of transferring responsibility for the Platteville operation, it is beyond doubt that Meadow Gold intended to include that transfer as an integral part of its efforts to establish a new arrangement that would enable it to acquire raw milk at competitive rates. Consequently, AMPI cannot withdraw as collateral its takeover of Platteville from the list of acts that suggest its assent to Meadow Gold's terms.

fact contract is not conclusively proved unless it is shown that the parties, by their words, their conduct, or course of dealing, came to a mutual agreement and this determination in turn depends upon an objective assessment of the parties' external expressions of intention as distinguished from their undisclosed intentions.")

For more than two months, AMPI supplied milk to Meadow Gold without objection, despite the fact that Meadow Gold repeatedly warned AMPI that it would pay only the Super Pool price for the milk. To hold its negotiating ground, AMPI might have refused to ship the milk. But Meadow Gold made it clear it would pay no more than the Super Pool price and for more than two months AMPI furnished milk without objection. In addition, internal communications at AMPI cannot defeat an agreement to supply milk at the Super Pool price.[5]

AMPI argues that the facts would allow a reasonable inference that it did not agree to Meadow Gold's new position on price and on the terms of operation of Platteville. This contention is unsustainable. First, any argument that AMPI did not understand Meadow Gold's new policy of paying only the Super Pool price fails in the face of Meadow Gold's repeated communications. Even if Meadow Gold's September 11 letter did not make clear that it was an offer for a new pricing arrangement, the demand for a price change was certainly established by the September 29 letter and the decision to cancel the Platteville lease and abandon production responsibility. Second, the very language of the September 29 letter is inconsistent with any notion that Meadow Gold was asking AMPI to assume control of Platteville and then charge the facility's operating costs back to Meadow Gold as a premium above the Super Pool level. The letter of September 29 asserts that the Super Pool price should be sufficient to cover total cost:

> Our position is fair because 1) the Super Pool price is the price our competition is paying the markets; 2) the purpose of a Super Pool is to equalize cost to all handlers; and 3) it is the responsibility of the pool committee (which we are not a member of) to establish price and pro-rate cost among its participants. With the increased Super Pool premium level on October 9, 1989, there should be enough money in the pool to cover the costs necessary to bring in the milk required for the Southern Illinois market. Should the premium level not be sufficient, then the Super Pool committee should make the necessary adjustments. We understand the pool committee is going to review costs following the October pool.

Br.Aplt., App. at 23, ¶ 3.

We also reject AMPI's contention that Meadow Gold's September 29 letter was a

---

**5.** AMPI tries to offset the weight of the evidence indicating that it assented to Meadow Gold's terms by drawing attention to its only objective manifestation of disagreement: the September 19 letter. AMPI mistakenly relies on the "battle of the forms" analysis of Wis.Stat. § 402.207(3), which provides that

> [c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 401 to 411.

Wis.Stat. § 402.207(3). Section 402.207's application is limited, however, " 'to the situations in which an agreement has been previously reached.' " Wis.Stat. § 402.207 (Official U.C.C. Comment 1); cf. Advance Concrete Forms, Inc. v. McCann Constr. Specialties Co., 916 F.2d 412, 415 (7th Cir.1990) (quoting Mid–South Packers, Inc. v. Shoney's, Inc., 761 F.2d 1117, 1123 (5th Cir.1985)) (stating that § 402.207 applies to confirmatory writings which add new terms). AMPI argues that, since it rejected Meadow Gold's price offer in its September 19 letter, there could not have been a contract for milk at the Super Pool price.

This argument fails for two reasons. First, as of the time that AMPI sent its September 19 letter, the parties had not agreed whether to lower the price of Platteville milk and AMPI had not yet engaged in any of the conduct (including shipment) that we find demonstrated its assent to Meadow Gold's terms. Consequently, there was no valid contract as of September 19 and § 402.-207 could not have applied at that time. Second, the fact that AMPI may not have intended to agree to Meadow Gold's terms as of September 19 did not preclude the parties from contracting after Meadow Gold renewed its offer in its September 29 letter. Thus, the September 19 letter does not weaken the objective manifestation of intent consisting of AMPI's shipment of milk and other conduct subsequent to Meadow Gold's September 29 letter.

proposal to amend the terms of a pre-existing course of dealing between the parties. AMPI argues that, even if the district court were correct in finding a new contract, Meadow Gold cannot prevail because the parties' prior course of dealing at the old price provides a "supplementary term" which should be incorporated into the new contract under § 402.207(3).

 Under Wisconsin law, a course of dealing "is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Wis.Stat. § 401.205(1). Generally, a course of dealing does not establish a "common basis for understanding" where it is clear that the parties are no longer operating under the old terms. This is certainly true when one party has specifically objected to the course of dealing price and proposed a new price. *See, e.g., Weed v. Lepianka,* 30 Wis.2d 198, 140 N.W.2d 305, 308–09 (1966) (insurer's notification that present coverage would not be extended unless insured paid premium and that no credit would be extended negated insured's claim that course of dealing afforded coverage on credit basis); *see also Columbus Milk Producers' Cooperative v. Department of Agric.,* 48 Wis.2d 451, 180 N.W.2d 617, 622 (1970) (dicta); *see cf. Clear View Estates, Inc. v. Veitch,* 67 Wis.2d 372, 227 N.W.2d 84, 87 (1975).

On both September 11 and September 29, Meadow Gold informed AMPI in writing that it no longer wanted or intended to pay more than the Super Pool price for milk from the Platteville and Highland facilities. Thus, Meadow Gold specifically repudiated the course of dealing with respect to price, and the old price can hardly serve as a supplementary term in the parties' contract. The two cases cited by AMPI are inapposite,[6] since they do not address the issue of the relevance of a prior course of dealing after one party has insisted on a different term.

**6.** AMPI cites *Gord Indus. Plastics, Inc. v. Aubrey Mfg., Inc.,* 103 Ill.App.3d 380, 59 Ill.Dec. 160, 164–65, 431 N.E.2d 445, 449–50 (1982) (remanding, as a question of fact, for determination whether certain fee was incorporated into contract by prior course of dealing or trade usage),

Thus, the parties are not bound by their prior course of dealing.

### III.

Having rejected AMPI's "reasonable inference" and course of dealing arguments, and having found that all of AMPI's conduct, when viewed objectively, is either unavailing to its present argument or is in fact supportive of a contract at the Super Pool price, we find that there is no genuine issue of material fact here. It would be unreasonable to infer that the parties did not contract at the Super Pool price.

AFFIRMED

and *Dresser Indus., Inc. v. Gradall Co.,* 702 F.Supp. 726, 733–34 (E.D.Wis.1988) (summary judgment precluded because material fact existed as to which of two warranties was in effect), *aff'd,* 965 F.2d 1442 (7th Cir.1992).