In re S.N.A. NUT COMPANY, Debtor.

S.N.A. NUT COMPANY, Plaintiff,

v.

The HAAGEN–DAZS COMPANY, INC., Defendant.

Bankruptcy No. 94 B 5993.
Adversary No. 96 A 1237.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 20, 1998.

Catherine Steege, for Plaintiff.

Peter A. Silverman, Chicago, IL, for Defendant.

### Memorandum Opinion

ERWIN I. KATZ, Bankruptcy Judge.

S.N.A. Nut Company ("SNA" or "the Debtor") supplied Haagen Dazs Company, Inc. ("HD") with nuts and other products that HD used to manufacture ice cream. The Debtor filed a two count adversary complaint against HD. Count I of the complaint alleges that HD breached five contracts for the supply of nuts: 1) 630,000 pounds 16/8 Diced Almond Pieces Dark Roast ("Almond Contract"); 2) 121,020 pounds of roasted and salted small walnut pieces ("Walnut Contract"); 3) 325,000 pounds of coated macadamia brittle ("Macadamia Brittle Contract"); 4) 35,000 pounds of coated macadamia brittle fines ("Fines Contract"); and 5) 200,000 pounds of coated macadamia brittle for mini cups ("Mini Contract"). SNA alleges that HD breached the contracts by refusing to take delivery of the product it was contractually obligated to purchase. Count II of the complaint alleges that SNA was damaged by its reliance on HD's requests for product manufacture when HD failed to purchase the product.

In its answer to the complaint, HD denies that a contract existed. In the alternative, assuming a contract exists between the parties, HD asserts fifteen (15) affirmative de-

fenses: 1) statute of frauds [1]; 2) SNA rejected the almond and walnut contracts; 3) SNA did not tender delivery of the goods; 4) SNA's claim is barred by judicial estoppel; 5) SNA's claim is barred by equitable estoppel; 6) HD is entitled to set off any amount it owes to SNA by the amount SNA saved; 7) SNA did not provide HD with reasonable notice of its intent to liquidate and resell the manufactured and raw product; 8) SNA's claim is barred by res judicata; 9) SNA failed to mitigate its damages; 10) SNA repudiated the contracts by failing to timely provide adequate assurance of performance; 11) SNA failed to reasonably hold the finished product in inventory for HD, precluding recovery for contract price; 12) SNA's claims are barred by impossibility or impracticability of performance; 13) SNA repudiated the pecan contract; 14) HD was entitled to cover the almonds it needed and reduce the almond contract by a like amount; and 15) the length of the contracts was extended by course of dealing.

The Debtor moved for summary judgment on its complaint, alleging that it was entitled to recover its damages as a matter of law since HD's answer to the complaint and affirmative defenses raised no material issues of fact. It is this motion which is before the court for determination. For the reasons stated below, SNA's motion for summary judgment is granted in part and denied in part.

### Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) as a matter arising under the Bankruptcy Code. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(O) as a proceeding to adjust the relationship between the debtor and a creditor. This matter is before the court pursuant to a referral from the United States District Court for the Northern District of Illinois.

### Standards for Summary Judgment

Under Federal Rule of Civil Procedure 56(c) (made applicable by Federal Rule of Bankruptcy Procedure 7056), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industustrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990). The burden is on the moving party to show that there is no such factual dispute. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The party opposing the motion may not rest upon pleadings, allegations or denials. The response of that party must set forth in required filings specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 567 (7th Cir.1989); *Patrick v. Jasper County*, 901 F.2d 561, 564–66 (7th Cir.1990).

On summary judgment motions, inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*; *Peerman v. Georgia–Pacific Corp.*, 35 F.3d 284, 286 (7th Cir.1994); *Billups v. Methodist Hospital of Chicago*, 922 F.2d 1300, 1302 (7th Cir. 1991). However, a material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir.1987).

The court should not "weigh the evidence." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Illinois Bell Telephone Co. v. Haines and Company, Inc.*, 905 F.2d 1081, 1087 (7th

---

**1.** In "Haagen–Daz's Response to Debtor's Motion for Summary Judgment," HD states that it has withdrawn statute of frauds as an affirmative defense. Accordingly, summary judgment will be entered in favor of SNA on this affirmative defense.

Cir.1990). However, "[i]f evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 250, 106 S.Ct. 2505; *Trautvetter,* 916 F.2d at 1147. When the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment should be granted. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

In a situation where the court cannot enter judgment on the entire case, Rule 56(d) permits the court to enter partial summary judgment. Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216–17 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987); *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr. N.D.Ill.1989); *Strandell v. Jackson County,* 648 F.Supp. 126, 136 (S.D.Ill.1986). By utilizing Rule 56(d), a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56. *Capitol Records,* 106 F.R.D. at 29.

### Undisputed Facts

The court, based upon its examination of the pleadings and other evidence before it, finds that the following facts exist without substantial controversy.

SNA is an Illinois corporation which had its principal place of business in Elk Grove Village, Illinois. HD is a Delaware corporation whose principal place of business was Teaneck, New Jersey.

The parties' relationship began in 1984 when HD purchased pecans from SNA. Thereafter, HD began to purchase other nuts and candy products from SNA. (12M,N para. 3)[2]. By 1993–94, HD was purchasing $5–9 million of SNA's products. (12M,N para. 6).

The products purchased by HD were manufactured in accordance with HD's specifications and standards.(12M,N para.5). SNA produced the products either by using the recipe and specifications given to it by HD, or, by the parties working together to develop the necessary recipes and product specifications. (12M,N para. 5). For example, the parties worked together to develop the coated macadamia brittle which HD used in some of its ice cream. All of the recipes that SNA used to manufacture products for SNA were considered highly confidential, and were the subject of confidentiality agreements between the parties. (12M,N para.5).

SNA and HD reached oral sales agreements for HD's purchase of goods from SNA, including walnuts, almonds and various macadamia products. It was HD's corporate policy not to sign the form contracts sent by its suppliers; HD followed this policy with SNA. Instead of signing SNA's form contract, Hank Rich ("Rich"), the independent sales broker who established SNA's relationship with HD and acted as SNA's broker for the HD account. (12M,N para. 7; 12M ex G), and HD's purchasing director, either Cliff Stecker or Richard Reider ("Reider"), orally agreed upon the price and quantity for the products HD wanted to buy from SNA. (12M,N para. 10). After Rich and HD's purchasing director negotiated the terms, HD issued a purchase order which contained the terms negotiated between the parties. (12M,N para. 10).

For products where HD had agreed to purchase a specific quantity, HD would generally take delivery of the product over the life of the contract (12M,N para. 11), and would phone in its orders to Rich. (12M,N para. 13). HD would predict its need for product by providing SNA with usage forecasts. (12M,N para. 12). The forecasts enabled SNA to manage its production and inventory since the forecasts served as the upper limit of what the Debtor would pro-

---

**2.** References to 12M or 12N are to Rule 12 of the Rules of the United States District Court, Northern District of Illinois.

duce. (12M, N para. 12, 12N ex. G). Rich's office prepared monthly balance reports which showed the amount of finished product SNA had shipped to HD and the amount remaining to be shipped to HD. (12M,N para.11). At least occasionally, these reports were provided to HD. For example, HD received a contract balance report for macadamia products on October 6, 1994. (12N para. 11).

HD purchased a significant amount of product from SNA. The parties agree that for the products at issue, HD purchased 244,-400 pounds of almonds; 53,350 pounds of walnuts; 129,880 pounds of macadamia brittle; 6,360 pounds of macadamia fines, and 82,520 pounds of macadamia brittle for mini cups. (12M, 12N para. 47).

On March 2, 1994, several of SNA's creditors filed an involuntary chapter 7 petition against SNA in Texas. Thereafter, SNA advised its customers that an involuntary petition had been filed but that it intended to continue its operations. HD retained secondary suppliers for nut products, and SNA understood that it would need to adjust its production of product accordingly. (12N ex. G, H).

In March 1994, HD requested in writing that SNA provide it with proof of liability insurance and with financial information. (12N, ex. Y). In response, SNA gave HD insurance information in May 1994. During that time, HD ordered products from other suppliers (12N para. 64–73), but did not terminate its relationship with SNA. At the end of May 1994, officers of SNA met with HD representatives and verbally reassured HD that SNA could continue to timely produce and deliver product to HD (12N para. 64–73). However, according to HD, in October 1994, after SNA announced its liquidation, Reider verbally renewed his request to Rich for reasonable assurance that SNA could continue to provide HD with product (12N para. 64–73). Rich did not respond to Reider's request (12N para. 64–73).

HD took its last delivery of walnuts on July 15, 1994; almonds on October 7, 1994, macadamia brittle on November 2, 1994; macadamia mini cups on September 9, 1994, and macadamia fines on October 7, 1994.

The price of walnuts and almonds declined throughout 1994 while the price of pecans rose. (12M ex. 122, HD response 39).

HD admits that it in October 1994, it decided not to pay several outstanding bills from SNA, due to problems the parties were experiencing. On November 8, 1994, HD informed SNA that it was withholding payment on certain invoices.

## DISCUSSION

SNA contends that, as a matter of law, summary judgment on its complaint for breach of the contracts should be granted because there can be no legitimate dispute regarding the facts material to a determination of SNA's contract claims. According to SNA, there were enforceable contracts between the parties, HD breached the contracts, and SNA suffered damages as a result of the breach.

Not surprisingly, HD has a different view than SNA. HD contends that summary judgment is not appropriate because there are material questions of fact concerning all of the elements of SNA's case. HD denies that the agreements between the parties constitute enforceable contracts, denies that it repudiated the contracts, and disputes SNA's calculation of damages.

### Do enforceable contracts exist?

The parties agree that Article 2 of the Uniform Commercial Code governs their dispute. Under Uniform Commercial Code section 2–204(1), "[A] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a contract."

SNA alleges that HD failed to pay for product it was obligated to purchase in the future. As a threshold matter, the court must determine whether the parties reached an agreement for the sale and purchase of nut products. HD admits that it actually did purchase almonds, walnuts, macadamia brittle, macadamia fines and macadamia brittle for mini cups from SNA. (12M, 12N para. 47).

 There is no evidence that the parties signed a single written contract. Rather, the parties agree that HD and SNA would reach an oral agreement, SNA would send a form contract to HD, HD would not sign the form contract but would send SNA purchase orders with the same terms. (12N, para.10). However, SNA shipped, and HD accepted delivery of nuts. Conduct by the parties which recognizes the existence of a contract can create a contract if that was the parties' intent, even if there is no written contract. *See* U.C.C. §§ 2–204(1), (3)[3], 2–207(3)[4]; *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268 (7th Cir.1994)(contract between milk supplier and milk processor was formed even though they did not agree on price, where the supplier assented to the processor's price by its conduct); *Quaker State Mushroom Company, Inc. v. Dominick's Finer Foods, Inc. of Illinois*, 635 F.Supp. 1281 (N.D.Ill.1986)(conduct of the parties can establish a contract; although conduct of the parties indicated the existence of a contract, the parties did not intend to be bound without an agreement on price, and there was no agreement on price). Sellers usually do not ship and buyers do not receive goods unless they think they have struck a deal. *Quaker State Mushroom Company, Inc. v. Dominick's Finer Foods, Inc. of Illinois*, 635 F.Supp. 1281 (N.D.Ill. 1986). However, if the parties do not agree on an essential term of a contract, no contract exists. *Id.*

*Almond Contract*

HD does not contest the price and quantity terms of its agreement with SNA. HD and SNA only dispute the expiration date of the contract. The parties agree that the contract was for about a year but do not agree on when that time period commenced. HD claims that the Almond Contract ran from February 1994 to at least February 1995, whereas SNA contends that the Almond Contract ran from November 1993 to August 31, 1994.

To support its contention that the contract expired on August 31, 1994, SNA relies on a "sales contract" dated October 4, 1993, attached to Rich's affidavit (12M ex. G). This document provides that HD agreed to purchase 630,000 pounds of almonds at $3.75/lb no later than August 31, 1994. In addition, the contract balance prepared by Rich's office in November 1993 specifies that HD will purchase 630,000 pounds of almonds by August 1994, as well as the price and delivery location. (12M ex. B, para. 18; 12M ex K)[5].

 HD relies on denials to dispute SNA's assertion that the contract expired on August 31, 1994. HD has not produced its purchase orders to support its assertion that the contract expired in February 1995. HD denies that it received the contract balance report, even though the document was apparently transmitted to Reider by facsimile. Without more support, HD's mere denials are not sufficient to create a material issue of fact.

HD also asserts, as an affirmative defense, that the duration of the contract was extended by the course of dealing between the parties. This issue is discussed *infra*.

 The court finds that there was a contract between the parties for the sale of almonds. The terms of the contract provided

---

3. Section 2–204(3) of the Uniform Commercial Code provides:

 (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

4. Section 2–207(3) of the Uniform Commercial Code provides:

 (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of this Act.

5. In its 12N Statement, HD denies that Reider, HD's incoming purchasing director, requested that SNA notify HD about the status of each outstanding contract, and denies that SNA provided Reider with contract balance forms, including a contract balance for almonds and that he did not object to it. The denial is puzzling because in HD's Response to the Debtor's Proposed Findings of Fact and Conclusions of Law (12M ex. B), HD admitted the same facts. (12M ex. B, para. 18).

that SNA would sell, and HD would purchase, 630,000 pounds of almonds by August 31, 1994, at a price of $3.75 per pound. Accordingly, partial summary judgment on the issue of whether an almond contract exists is entered.[6]

### Walnut Contract

HD contests the quantity term of the Walnut Contract. According to SNA, on or about November 29, 1993, Rich and Reider reached an oral agreement whereby HD would purchase 121,020 pounds of walnuts by September 30, 1994, at $3.95 per pound. See Rich Affidavit (12M ex. G). At his deposition, Stecker (HD's purchasing director) testified he did not recall whether he received a walnut contract from SNA but believed that he most likely entered into a contract to buy walnuts from SNA. (ex. E to 12M, p. 90).

On January 13, 1994, Ms. Weber of SNA faxed a contract balance form to Reider's assistant. This form contained the price and quantity for the sale of walnuts. (12M ex. L).

HD admits that it purchased some walnuts from SNA but asserts that it purchased walnuts on an "as needed" basis. To support its argument, HD contends that Rich testified there was no walnut contract (12N ex. 1, p. 145–46). Moreover, the inventory report prepared by Rich's company HD indicates that walnuts were purchased by HD on an as needed basis. (12N ex. I). In addition, the forecast reports HD sent to SNA did not include walnuts (12N ex. J). Nor did SNA keep walnuts in inventory.

■ In a motion for summary judgment, the court may not weigh the evidence before it. The evidence before the court regarding the quantity term of walnuts is conflicting and ambiguous. The quantity of walnuts (if any) that HD was obligated to purchase from SNA is a material issue of fact. The court

cannot find that there is a contract between the parties for the sale of walnuts. Accordingly, partial summary judgment on whether there was a contract between the parties for the sale of walnuts is denied.

### Macadamia Brittle Contract

HD disputes the duration term of the macadamia brittle contract but does not contest the quantity or price terms of the macadamia brittle agreement.

HD admits that on June 2, 1994, it agreed to purchase from SNA 325,000 pounds of macadamia brittle at $2.735 per pound (12N para. 24). HD also admits that it purchased 129,880 pounds of macadamia brittle. (12N, para. 47). HD contends that its agreement was on an annual basis and expired in June 1995. (12N para 24; Rich affidavit, p. 172, 12N ex. A).

The sales contract, prepared by SNA but not signed by HD, states that the contract expired on December 31, 1994.[7] The only documentary evidence before the court regarding the macadamia brittle contract is the form contract prepared by SNA. HD has not produced its purchase order as an exhibit to this proceeding. These allegations are not sufficient to set forth specific facts showing that there is a genuine issue of fact to be decided by a trial. The evidence before the court is not facially ambiguous: the contract expired on December 31, 1994.

In its defense, HD asserts that the expiration date of the contract was extended by the course of dealing between the parties. For reasons which are discussed *infra*, the court finds that the course of dealing between HD and SNA does not succeed as an affirmative defense.

■ The court finds that there was a contract between the parties for the sale of macadamia brittle. The terms of the contract provided that SNA would sell, and HD

---

6. In light of this court's finding that the almond contract expired on August 31, 1994, HD's second affirmative defense, that SNA rejected the almond contract in its plan of reorganization, will not be considered, since the almond contract expired before the plan of reorganization was filed.

7. HD contends that the contract ran to June 1995 because Rich testified at his deposition that he received a letter stating that the macadamia brittle contract ran from June 1994 to June 1995. (HD ex. A to 12N, p. 172). The letter has not been included as an exhibit to either SNA's 12M statement or to HD's 12N statement.

would purchase, 325,000 pounds of macadamia brittle by December 31, 1994, at a price of $2.735 per pound. Accordingly, partial summary judgment on the issue of whether a macadamia brittle contract exists is entered.

### Macadamia Fines Contract

HD has not expressly disputed the terms of the macadamia fines contract. (12N para 24). HD admits that Reider sent Rich a letter on June 2, 1994, wherein HD agreed to purchase from SNA 35,000 pounds of macadamia brittle fines (12N para. 24). HD also admits that it purchased 6,360 pounds of macadamia brittle fines. (12N, para. 47). SNA asserts that the contract expired on December 31, 1994, based on the sales contract prepared by SNA but not signed by HD (12M. ex G). This is the only documentary evidence before the court regarding the macadamia brittle fines contract, and HD does not dispute its terms.

■ The court finds that there was a contract between the parties for the sale of macadamia brittle fines. The terms of the contract provided that SNA would sell, and HD would purchase, 35,000 pounds of macadamia brittle fines by December 31, 1994, at a price of $2.735 per pound. Accordingly, partial summary judgment on the issue of whether a macadamia brittle fines exists is entered in favor of SNA.

### Macadamia Brittle for Mini Cups Contract

HD contests the quantity term of the sales agreement for macadamia brittle for mini cups.

SNA contends that HD was obligated to purchase 200,000 pounds of coated macadamia brittle for mini cups at $2.735 per pound. (12M para. 47, exhibit G to 12M), but HD contends that it did not agree to purchase a specific amount of mini macs. Instead, HD contends that it ordered mini macs on an as needed basis. (12N para. 24, 12M ex. M). HD admits that it purchased 82,520 pounds of mini macs from SNA.

The parties agree that in the June 2, 1994 letter from Reider to Rich, HD did not agree to purchase a specific quantity of mini macs. The parties also agree that Rich responded to Reider's letter and requested that HD commit to purchasing a set amount of mini macs. (12N para. 24). The parties' recitation of the facts diverge at this point. SNA contends that pursuant to a June 9, 1994 letter from Rich to Reider, HD eventually agreed to purchase 200,000 pounds of mini macs. (12M para. 26, 12N ex. O). Once it had this information, SNA prepared its standard contract and sent this to HD. (12M para. 28). Thereafter, SNA sent HD contract balance forms which indicated that HD had a balance of mini cups to order (12M ex. P).

HD denies that it received the June 9, 1994 letter, denies that it agreed to purchase a specific amount of mini macs, and denies that it received the contract balance report. To support its contention that it purchased mini macs on an as needed basis, HD asserts that its forecasts did not include mini macs (12N ex. F); the inventory reports it received from SNA did not include mini macs (12N ex. J); and SNA did not keep significant amounts of mini macs in inventory (12N ex. I).

■ In a motion for summary judgment, the court may not weigh the evidence before it. The evidence before the court in concerning whether HD was obligated to purchase a specific amount of mini macs is ambiguous. Whether HD was obligated to purchase a specific quantity of mini macs from SNA is a material issue of fact. Accordingly, the court cannot find that a contract for the sale of mini cups existed between the parties, and partial summary judgment is denied.

### Course of Dealing

HD contends that regardless of the expiration date stated on the contract balance forms and sales contracts prepared by SNA, the expiration dates were extended by the course of dealing between the parties. (12N para. 9, 11, 12N ex. A pp. 57–63). HD contends that where it agreed to purchase a specific quantity of product over the life of the agreement, it took delivery of the product over time until it had purchased the specified amount. If HD had not taken delivery of all of the product by the contract expiration date, the contract was extended by rolling the unused balance into the next con-

tract. Thus, HD contends that the duration term of the contracts is disputed, and that it therefore did not repudiate the contracts by failing to take delivery of all the product by the expiration date.

■ The only support HD offers for its contention that the expiration dates of the contracts were extended is Rich's statement that remaining balances were rolled into the following year's contract and the price adjusted. (12N ex. A, pp. 56). That statement, standing alone, requires no such inference. HD has produced no evidence directly on issue, such as its purchase orders or other contracts, to support its contention that expiration dates were extended. This evidence is not sufficient to set forth specific facts showing that there is a genuine issue of fact to be resolved by a trial. Thus, there is no question of fact regarding the expiration date of the contracts. In the absence of a factual question, the court finds that the almond, macadamia brittle and macadamia fines contracts expired on the dates stated by SNA.[8] Accordingly, summary judgment on the issue of whether course of dealing extended the contracts' expiration date is entered in favor of SNA.

## II. Did HD breach the contracts?

■ The court has reviewed the balance of the allegations made by SNA and HD's affirmative defenses. Based on its examination of the pleadings and the evidence before it, the court finds that material issues of fact exist with respect to whether: (1) HD anticipatorily repudiated the contracts; (2) whether HD was excused from performance under the contracts because SNA failed to give HD adequate assurance of performance (Tenth Affirmative Defense); (3) whether SNA tendered the products (Third Affirmative Defense); (4) whether SNA rejected HD's repudiation; and (5) whether SNA could perform under the contracts (Twelfth Affirmative Defense). Accordingly, summary judgment on these affirmative defenses is denied.

8. Because the court finds that the evidence on which HD relics to create a question of fact regarding the expiration date of the contracts is insufficient, the court need not, and does not,

*Judicial Estoppel*

HD's fourth affirmative defense is that SNA's claim is barred by the doctrine of judicial estoppel. The court examined this issue in connection with the "Debtor's Supplement to Motion in Limine to Bar Evidence Relating to Haagen–Dazs' Newly Added Affirmative Defenses." On May 28, 1998, the court disposed of this affirmative defense. The order states:

> This matter coming to be heard at a scheduled hearing in the above-captioned case; Haagen–Dazs's counsel having failed to appear. It is therefore ordered that the Court clarifies its Ruling on the Debtor's Motion in Limine to Bar Newly Added Affirmative Defenses and grants that motion with respect to Haagen–Dazs Fourth Affirmative Defense. The evidence regarding judicial estoppel/mend the hold is barred.

Accordingly, partial summary judgment is entered in favor of SNA on HD's fourth affirmative defense.

*Equitable Estoppel and Res Judicata*

HD's fifth affirmative defense is that SNA is equitably estopped from asserting its claims against HD, and HD's eighth affirmative defense is that SNA's claim is barred by the principle of res judicata. The court addressed these issue in connection with SNA's "Motion in Limine to Bar Evidence Relating to the Haagen–Dazs Company's Fourth, Fifth and Eighth Affirmative Defenses." On May 21, 1998, the court disposed of this affirmative defense. The order states:

> Although S.N.A. Nut Company ("S.N.A.") did not, at the time of Haagen–Dazs Company's ("Haagen–Dazs's") prior motion for summary judgment, present a cross-motion for summary judgment, identical issues are not presented by S.N.A.'s Motion *In Limine* to Bar Evidence Relating to Haagen–Dazs's Fourth, Fifth, and Eighth Affirmative Defenses. (Footnote omitted). Having already ruled on those issues, *see S.N.A. Nut Co. v. Haagen–Dazs Co.*, 215

reach the question of whether such evidence, if sufficient, would be admissible within the parameters of the parol evidence rule.

B.R. 1004 (Bankr.N.D.Ill.1997), **IT IS** hereby **ORDERED** that S.N.A.'s Motion *In Limine* to Bar Evidence Relating to Haagen–Dazs's Fourth, Fifth, and Eighth Affirmative Defenses is granted.

Accordingly, partial summary judgment is entered in favor of SNA on HD's fifth and eighth affirmative defenses.

### III. Damages

[12] The court has reviewed the allegations made by SNA and HD's affirmative defenses. Based on its examination of the pleadings and the evidence before it, the court finds that material issues of fact exist with respect to SNA's calculation of damages under section 2–708 of the U.C.C. and all of HD's affirmative defenses concerning the calculation of damages: offset (Sixth Affirmative Defense); reasonable notice (Seventh Affirmative Defense); mitigation (Ninth Affirmative Defense); whether SNA held the product for a sufficient time (Eleventh Affirmative Defense) and coverage on the almond contract (Fourteenth Affirmative Defense).

### CONCLUSION

For the reasons stated, summary judgment is denied in part and granted in part.

### ORDER

For the reasons set forth in the Memorandum Opinion, dated November 20, 1998, and this matter coming before the court on S.N.A. Nut Company's motion for summary judgment, partial summary judgment is entered in favor of S.N.A. Nut Company.

Summary judgment is entered in favor of S.N.A. Nut Company on the following issues, and the court finds that:

(A) S.N.A. Nut Company and The Haagen–Dazs Company had a contract for the sale and purchase of 630,000 pounds of almonds by August 31, 1994, at a price of $3.75 per pound;

(B) S.N.A. Nut Company and The Haagen–Dazs Company had a contract for the sale and purchase of 325,000 pounds of macadamia brittle by December 31, 1994, at a price of $2.735 per pound;

(C) S.N.A. Nut Company and The Haagen–Dazs Company had a contract for the sale and purchase of 35,000 pounds of macadamia fines by December 31, 1994, at a price of $2.735 per pound;

(D) the statute of frauds is not a defense to S.N.A. Nut Company's claims against The Haagen–Dazs Company, Inc. (First Affirmative Defense);

(E) S.N.A. Nut Company's claim against The Haagen Dazs Company, Inc. is not barred by judicial estoppel (Fourth Affirmative Defense);

(F) S.N.A. Nut Company's claim against The Haagen Dazs Company, Inc. is not barred by principles of res judicata (Fifth Affirmative Defense);

(G) S.N.A. Nut Company is not equitably estopped from asserting its claims against The Haagen Dazs Company, Inc. (Eighth Affirmative Defense);

Summary judgment on the following issues is denied:

(A) whether S.N.A. Nut Company and The Haagen–Dazs Company had a contract for the sale and purchase of walnuts;

(B) whether S.N.A. Nut Company and The Haagen–Dazs Company had a contract for the sale and purchase of macadamia brittle for mini-cups;

(C) whether The Haagen–Dazs Company anticipatorily repudiated the contracts;

(D) whether The Haagen–Dazs Company was excused from performance under the contracts because S.N.A. Nut Company failed to give The Haagen–Dazs Company adequate assurance of performance (Tenth Affirmative Defense);

(E) whether S.N.A. Nut Company tendered the products (Third Affirmative Defense);

(F) whether S.N.A. Nut Company rejected HD's repudiation;

(G) whether S.N.A. Nut Company could perform under the contracts (Twelfth Affirmative Defense);

(H) calculation of damages;

(I) whether S.N.A. Nut Company provided reasonable notice (Seventh Affirmative Defense);

(J) whether S.N.A. Nut Company held the product for sufficient time (Eleventh Affirmative Defense);

(K) whether The Haagen–Dazs Company, Inc. was entitled to coverage on the almond contract (Fourteenth Affirmative Defense), and

(L) all other remaining issues.